## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

United States Postal Service,

               Plaintiff/Counter-Defendant,         Civ. No. 12-562 (RHK/JJK)

v.                                       **MEMORANDUM OPINION**
                                       **AND ORDER**

American Postal Workers Union, AFL-CIO,

               Defendant/Counter-Plaintiff.

_____

Teresa A. Gonsalves, James P. Verdi, United States Postal Service, Washington, D.C., Ana H. Voss, Bahram Samie, United States Attorney's Office, Minneapolis, Minnesota, for Plaintiff/Counter-Defendant.

Richard S. Edelman, O'Donnell, Schwartz & Anderson, PC, Washington, D.C., Justin D. Cummins, Brendan D. Cummins, Cummins & Cummins, PLLP, Minneapolis, Minnesota, for Defendant/Counter-Plaintiff.

_____

### INTRODUCTION

       This Court often is called upon to answer complicated questions of constitutional law, impose criminal sentences depriving individuals of their liberty, and opine on thorny issues regarding the fundamental rights of citizens. This case concerns something far more mundane: the size of storage lockers. But the issue apparently is of great importance to the parties, Plaintiff United States Postal Service (the "Postal Service") and Defendant American Postal Workers Union (the "Union"), which have litigated a dispute about lockers at the Eagan, Minnesota mail-processing facility for more than two years, through a three-step grievance process, binding arbitration, and now in this Court, where the Union seeks to confirm the underlying arbitration award and the Postal Service seeks

to vacate it.  The parties now cross-move for summary judgment.  For the reasons that follow, the Court will grant the Postal Service's Motion, deny the Union's Motion, and vacate the award.

## BACKGROUND

Although the parties' dispute is a simple one, the facts are complicated by a *very* muddled administrative record.  A careful review of that record, however, reveals that the material facts are undisputed, as set forth below.

## I.     The CBA

The Postal Service and the Union, which represents certain Postal Service employees, are parties to a collective-bargaining agreement ("CBA") requiring disputes over wages, hours, and conditions of employment to be resolved through a progressive, three-step grievance process.  (AR 102-21.)[1]  When that process fails to resolve a dispute, the parties must then participate in binding arbitration.  (Id. 103-09.)  "All decisions of the arbitrator[] shall be limited to the terms and provisions of [the CBA], and in no event may the terms and provisions of [the CBA] be altered, amended, or modified by an arbitrator."  (Id. 115.)

The CBA incorporates by reference the provisions of postal handbooks "directly relat[ing] to wages, hours or working conditions."  (Id. 136-37.)  At issue here are handbooks containing design criteria for the construction of postal facilities.  Those criteria include provisions for various types of employee accommodations, such as

---

[1] "AR" refers to the administrative record of the parties' grievance-arbitration proceedings, which has been jointly filed as Docket Number 16.

lunchrooms, storage areas, and key to this case, lockers for employee uniforms and

related garb.  It is undisputed that the design criteria for lockers "directly relate to . . .

working conditions" for Postal Service employees and, hence, any dispute regarding

them is subject to the CBA's grievance-arbitration process.

## II.     Design criteria

As of 2005, the design criteria for *all* newly constructed postal facilities were

contained in a handbook known as the "AS-503."  (Id. 784-85.)  This included the criteria

for mail-processing facilities ("MPFs"), previously known as "major facilities," which

are large buildings housing "massive machines and hundreds of employees" at which

mail is sorted and processed for daily delivery.  (Id.; Sparks Decl. ¶¶ 3, 5.)  The 2005

version of the AS-503 provided that MPFs (and all other buildings) were to have "single

tier, full height" lockers.  (AR 784.)

In 2007, the Postal Service amended the AS-503 and "extracted" the criteria for

"major facilities," compiling them in a separate document known as the "MPF Design

Criteria."  (Id. 772; Sparks Decl. ¶ 6.)  The 2007 AS-503 made this clear in several

places.  Its "Contents" section, for example, provided that "the criteria related to the

facility type formerly known as 'Majors' ha[ve] been extracted and compiled in a

separate folder named 'MPF' (Mail Processing Facilities)."  (AR 772.)  The section

entitled "How to Use This Handbook" contained the same language.  (Id. 773.)  And the

"Introduction" section provided that the requirements for MPFs "have been extracted . . .

and are now contained under a separate folder on the Building Design Standards CD-

ROM."  (Id. 778.)

The 2007 "extraction" of design criteria for MPFs resulted in two different locker standards for new Postal Service buildings, depending on the type of building in question. For *non*-MPFs, the AS-503 handbook applied; it provided that new buildings in certain regions of the country (Zones I and II, generally the southern two-thirds of the United States) were to receive "[d]ouble tier half-height lockers" or "full height half-wide lockers," while those in Zone III (the northern third of the country), including Minnesota, were to receive "full size lockers."  (AR 779.)  By contrast, the MPF Design Criteria handbook provided that MPFs in Zone III were to receive "full height half width lockers."  (Id. 782, 787-88.)[2]  In other words, Minnesota MPFs were to receive half-width lockers, while non-MPFs were to receive full-size ones.[3]

III.    **The Eagan facility and the grievance-arbitration process**

In 2008, the Postal Service commenced construction of a new mail processing and distribution center (P&DC) to replace the existing P&DC in Eagan, Minnesota.  (Id. 797.)  Construction was completed and the facility was opened in August 2010.  (Id.)  Because Minnesota is located in Zone III, half-width lockers were installed in the new building, pursuant to the 2007 MPF Design Criteria handbook.

The previous P&DC, however, had contained full-width lockers.  Displeased that its members were provided with smaller lockers than they had before, the Union invoked

---

[2] Full-width lockers are 15 inches wide, while half-width lockers are 7.5 inches wide.

[3] Complicating the record in this case, both the AS-503 and the MPF Design Criteria handbook were amended in 2010, and hence two different versions of these documents were cited during the grievance-arbitration process.  Yet, the 2010 versions contain the same operative language as their predecessors.  In other words, the 2010 MPF Design Criteria handbook contains the same provisions regarding lockers as the 2007 version, and the 2010 AS-503 contains the same provisions regarding lockers as the 2007 version.

the CBA and filed a grievance with the Postal Service in September 2010, asserting that

the new building violated the design criteria (and hence the CBA, which incorporates

those criteria) by "install[ing] and provid[ing] half-size lockers to . . . employees." (Id.

764.)  But in support, it cited the wrong document – the 2007 AS-503, which stated "[i]n

Zone 3, provide full-size lockers" – rather than the 2007 MPF Design Criteria handbook,

which required only half-width lockers.

### A.     Step 1

The Postal Service orally denied the Union's grievance at step 1 of the grievance

process.[4]  As there is no written decision, the basis upon which the grievance was denied

is unclear from the record.  However, the Union appealed the denial to step 2.  (AR 762.)

### B.     Step 2

On May 13, 2011, the Postal Service again denied the grievance.  But instead of

pointing out that the Union had invoked the wrong locker standard (the 2007 AS-503), it

claimed that the AS-503 had been amended in 2010 to permit smaller lockers, as part of a

cost-savings measure.  (AR 760.)  It concluded that "Handbook AS-503, Standard Design

Criteria (September 17, 2010)" prescribed "full height, *half width* lockers shall be used"

for MPFs in Zone III, and such lockers had in fact been installed at the Eagan P&DC.

(Id. 761 (emphasis added).)

As noted above, however, the AS-503 does not apply to MPFs, and hence at first

blush the Postal Service appears to have relied on the wrong handbook at step 2.  But a

closer examination of the step-2 decision makes clear that the Postal Service did not err.

---

[4] The CBA contemplates oral decisions at step 1.  (AR 103.)

This is because the language quoted by the Postal Service in its written decision – "full height, half width lockers shall be used" – *is not found in the AS-503*.  Rather, that language appears *only* in the MPF Design Criteria handbook.  (Compare AR 779 with id. 782.)  In other words, while the Postal Service *said* it was relying on the wrong document – the AS-503 – to deny the grievance, in actuality it was relying on the correct document, the MPF Design Criteria handbook, but mis-cited it as the AS-503.[5]

## C.     Step 3

The Union then appealed to step 3, but on August 19, 2011, the Postal Service once again denied its grievance.  (Id. 755.)  As at step 2, it noted that the applicable standard required only half-width lockers at the Eagan P&DC.  Yet it once again mis-cited to the AS-503, rather than the MPF Design Criteria handbook, for the controlling standard:  "[The Postal Service] cites the updated Handbook AS-503 dated September 17, 2010, which specifies that full height, half width lockers shall be used in [Z]one 3."  (Id.) To reiterate, no such language is found in either the 2007 or 2010 versions of the AS-503; it appears only in the MPF Design Criteria handbook.  Hence, it is clear the Postal Service actually relied on the MPF Design Criteria handbook, which contained the language quoted in its written decisions at step 2 and step 3.

_____

[5] This undermines the Union's contention that "[a]t no time during the processing of the grievance . . . did the USPS . . . cite [the] Mail Processing Facility Design Criteria."  (Def. Mem. in Supp. at 4.)  And notably, the Union does not appear to dispute that it was provided a copy of the 2010 MPF Design Criteria handbook at the step 2 hearing, and that document is part of the administrative record.  (See Pl. Mem. in Supp. at 8; Def. Mem. in Opp'n at 10; AR 780-82.)  Indeed, the Postal Service noted at oral argument that the Union actually *cited* the MPF Design Criteria handbook in the grievance process, although it misidentified that document as the AS-503.  (See AR 754.)

### D.    Arbitration

The Union next sought to arbitrate the parties' dispute.  Postal Service "Labor

Relations Specialist" Kenneth Glassburner was appointed to serve as the Postal Service's

"advocate" at the arbitration hearing.  In reviewing the record of the prior proceedings, he

discovered the errors noted above regarding citations to the MPF Design Criteria

handbook, as well as the fact that the Union was relying on the inapplicable standards

found in the AS-503.  He informed the Union's advocate (William Mellen) of these facts

and provided him with a copy of the *2007* MPF Design Criteria handbook, the version in

effect at the time the P&DC was built, in advance of the arbitration hearing.

(Glassburner Decl. ¶ 16.)

But when Glassburner attempted to use that document at the hearing, Mellen

objected that it had not been cited during the grievance process or previously entered into

the record.  (Id. ¶¶ 20-23; Mellen Decl. ¶ 13.)  The arbitrator sustained this objection,

ruling that the Postal Service could not rely upon the 2007 MPF Design Criteria

handbook to support its arguments.  This left Glassburner with only the *2010* MPF

Design Criteria handbook (which, as noted above, had previously been entered into the

record) to use at the hearing.

The arbitrator ultimately rejected the Postal Service's arguments and sustained the

grievance, primarily because the 2010 MPF Design Criteria handbook did not exist at the

time the Eagan P&DC was constructed.  (AR 803 ("The contract for the building of the

facility in question was issued [and] completed and the building occupied before the

Manual provisions were [effective].").)[6]  With the Postal Service having referred

(erroneously) to the AS-503 at steps 2 and 3 of the grievance process, it appears that the

arbitrator simply assumed that handbook applied.  And because the 2007 version of that

handbook required full-width lockers in Zone III, he ordered the Postal Service to replace

the P&DC lockers with full-width ones.  (Id. 802-04.)

## IV.   This action is filed

Invoking Section 1208(b) of the Postal Reorganization Act ("PRA"), 39 U.S.C.

§ 1208(b), the Postal Service commenced this action on March 2, 2012, seeking to vacate

the arbitration award due to the arbitrator's error in applying the AS-503 rather than the

MPF Design Criteria handbook.[7]  The Union then counterclaimed for confirmation of the

award.  Both parties now move for summary judgment.  The Motions have been fully

---

[6] Interestingly, the arbitrator made the same mistake the parties had made during the grievance process, erroneously referring to the 2010 MPF Design Criteria handbook as the AS-503. (See AR 798 (noting that "[o]n September 17, 2010, Handbook AS-503 was changed to read as follows with regard to the specifications of employee lockers," but then quoting from *the MPF Design Criteria handbook*, not the AS-503).)

[7] Section 1208(b) provides that "[s]uits for violation of contracts between the Postal Service and a labor organization representing Postal Service employees . . . may be brought in" federal court. Although the Postal Service sued to vacate the arbitrator's award and, hence, this is not technically a "suit[] for violation of" the CBA, see, e.g., Am. Postal Workers Union v. U.S. Postal Serv., 823 F.2d 466, 469 (11th Cir. 1987) (noting that Section 1208(b) "does not . . . explicitly authorize judicial review or enforcement of arbitration awards"), it has been recognized that the statute *implicitly* grants federal courts the power to review postal arbitration awards.  See, e.g., Am. Postal Workers' Union v. U.S. Postal Serv., 646 F. Supp. 2d 1, 3 (D.D.C. 2009); Elwell v. U.S. Postal Serv., No. 6:06-CV-1449, 2007 WL 1075130, at *2 (D.S.C. Apr. 6, 2007).  This is because the PRA is modeled on the Labor Management Relations Act of 1947 ("LMRA"), Abernathy v. U.S. Postal Serv., 740 F.2d 612, 614 (8th Cir. 1984), which itself authorizes the review of such awards, see W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers, 461 U.S. 757, 764 (1983).

briefed, and the Court held a hearing on the Motions on November 13, 2012.  They are

now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the

material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573

F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that

may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v.

Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible

evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528

F.3d 1074, 1078-79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this

approach is only slightly modified.  When considering the Postal Service's Motion, the

Court views the record in the light most favorable to the Union, and when considering the

Union's Motion, the Court views the record in the light most favorable to the Postal

Service.  "Either way, summary judgment is proper if the record demonstrates that there

is no genuine issue as to any material fact."  Seaworth v. Messerli, Civ. No. 09-3437,

2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, 414 F. App'x 882 (8th Cir. 2011) (*per curiam*).

## ANALYSIS

On the surface, this should be an easy case.  The record clearly indicates that the standards applicable to the Eagan P&DC were to be found in the MPF Design Criteria handbook, not the AS-503.  Indeed, the AS-503 expressly provides, in several places, that MPF standards had been "extracted" and relocated elsewhere.  (See AR 772 ("[T]he criteria related to the facility type formerly known as 'Majors' ha[ve] been extracted and compiled in a separate folder named 'MPF' (Mail Processing Facilities)."); id. 773 (same); id. 778 (MPF requirements "have been extracted . . . and are now contained under a separate folder on the Building Design Standards CD-ROM").)  It is apparent to the Court, therefore, that the arbitrator erred when utilizing an inapplicable document (the AS-503) to mandate full-size lockers at the P&DC.  While this would seem to require vacatur of the award, things are not that simple.

## I.    Judicial deference and "essence from the agreement"

What complicates matters here is the deference to which a labor arbitration award is entitled in federal court.  As the Union correctly notes, a district court's review of such an award is extremely limited; it must receive "an extraordinary level of deference." Schoch v. InfoUSA, Inc., 341 F.3d 785, 788 (8th Cir. 2003), abrogated on other grounds by Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576,  586 (2008); accord, e.g., Keebler Co. v. Milk Drivers & Dairy Emps. Union, Local No. 471, 80 F.3d 284, 287 (8th

Cir. 1996).[8]   Courts play "only a limited role when asked to review the decision of an

arbitrator," United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987),

because the parties have contractually agreed to resolve their disputes through the

arbitration process.   Stated differently, "[i]t is the arbitrator's construction [of the parties'

agreement] which was bargained for, and so far as the arbitrator's decision concerns

construction of the contract, the courts have no business overruling him because their

interpretation of the contract is different from his."   United Steelworkers of Am. v.

Enterprise Wheel & Car Corp., 363 U.S. 593, 599 (1960).   Hence, a narrow standard of

review is necessary "so that both employers and unions can be confident in obtaining the

decision of the arbitrator for which they have bargained." NCR Corp., E&M-Wichita v.

IAMAW, Dist. Lodge No. 70, 906 F.2d 1499, 1504 (10th Cir. 1990) (citation omitted);

accord, e.g., Misco, 484 U.S. at 37 ("[T]he moving party should not be deprived of the

arbitrator's judgment, when it was his judgment . . . that was bargained for.") (citation

omitted).

Furthermore, "[a]rbitration is not a perfect system of justice, nor is it designed to

be." Hoffman v. Cargill Inc., 236 F.3d 458, 462 (8th Cir. 2001).   When parties

contractually agree to such an imperfect system, courts must be loath to intervene.   Id.

("Parties should be aware that they get what they bargained for and that arbitration is far

different from adjudication.").   These principles are particularly apt in the labor-relations

---

[8] Many cases cited herein (and by the parties) arose under the LMRA rather than the PRA.   But
courts routinely apply LMRA decisions in actions arising under the PRA, as the latter is modeled
on the former.   See, e.g., U.S. Postal Serv. v. Am. Postal Workers Union, 553 F.3d 686, 688-89
(D.C. Cir. 2009) (LMRA cases "control the disposition of" PRA cases).

context, given its "decided preference for private settlement of labor disputes without the intervention of government." <u>Misco</u>, 484 U.S. at 37.  The strong public policy favoring the resolution of labor disputes in arbitration "would be undermined if courts had the final say." <u>Enterprise Wheel</u>, 363 U.S. at 596.

Because of the deference to which an arbitration award is entitled, courts generally cannot correct an arbitrator's factual errors or errors in his contract interpretation. <u>Misco</u>, 484 U.S. at 36.  As long as an arbitrator is "arguably construing or applying the contract and acting within the scope of his authority," an award cannot be set aside even where a court "is convinced [the arbitrator] committed *serious error*." <u>Id.</u> at 38 (emphasis added). Similarly, an arbitrator's "improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award." <u>Major League Baseball Players Ass'n v. Garvey</u>, 532 U.S. 504, 509 (2001) (*per curiam*) (citation omitted).  While this might seem harsh to parties who lose in arbitration, such a relaxed standard is "justified because it is exactly what the parties mutually agreed upon by electing arbitration over judicial resolution of their conflicts." <u>Electrolux Home Prods. v. United Auto. Aerospace & Agric. Implement Workers</u>, 416 F.3d 848, 853 (8th Cir. 2005).

These principles have been distilled into a now well-known "essence from the agreement" standard.  An arbitration award must be confirmed as long as it "draws its essence" from the parties' agreement. <u>E.g.</u>, <u>Am. Nat'l Can Co. v. United Steelworkers of Am.</u>, 120 F.3d 886, 889 (8th Cir. 1997).  An award "draws its essence" from an agreement where it is "derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." <u>Williams v. Nat'l Football</u>

League, 582 F.3d 863, 883 (8th Cir. 2009) (quoting Schoch, 341 F.3d at 788). What matters "is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they *clearly* erred in interpreting the contract; it is not whether they *grossly* erred in interpreting the contract; it is [simply] whether they interpreted the contract. *If they did, their interpretation is conclusive.*" Hill v. Norfolk & W. Ry. Co., 814 F.2d 1192, 1195 (7th Cir. 1987) (emphases added) (citations omitted) (cited with approval in McClendon v. Union Pac. R.R. Co., 640 F.3d 800, 804 (8th Cir. 2011)).

## II.     The award must be vacated

The Union argues that the award must be confirmed under this deferential standard.  It contends that the arbitrator "cit[ed] language of the [AS-503] that required full size lockers in facilities located within Zone III" and, hence, the award was "premised on [his] interpretation of the CBA and application of that interpretation to the facts of the case."  (Def. Mem. in Supp. at 12, 15; Def. Mem. in Opp'n at 23-24.)  In other words, the Union contends that although the arbitrator utilized criteria contained in the wrong document (the AS-503) to compel the installation of full-width lockers at the P&DC, the award must be upheld because it (mis)applied the terms of, and hence "draws its essence from," the CBA.

There is some superficial appeal to this argument.  To be sure, the Court believes the arbitrator erred in applying standards found in the AS-503 rather than the MPF Design Criteria handbook, but an award cannot be set aside based on the Court's belief that the arbitrator committed even serious error.  Misco, 484 U.S. at 38.  The question to be answered is whether the arbitrator *interpreted the contract*, not whether he got that

interpretation wrong (or even seriously wrong).  Hill, 814 F.2d at 1195.  A reasonable

argument can be made that the arbitrator interpreted the CBA here, albeit incorrectly.

Upon closer scrutiny, however, the Union's argument fails.  While it is true that an

arbitrator is entitled to nearly unfettered leeway when interpreting contract language, *he*

*may not* "disregard or modify unambiguous contract provisions."  Mo. River Servs., Inc.

v. Omaha Tribe of Neb., 267 F.3d 848, 855 (8th Cir. 2001) (quoting Osceola Cnty. Rural

Water Sys., Inc. v. Subsurfco, Inc., 914 F.2d 1072, 1075 (8th Cir. 1990)); accord, e.g.,

Misco, 484 U.S. at 38 ("[T]he arbitrator may not ignore the plain language of the

contract."); Crawford Grp., Inc. v. Holekamp, 543 F.3d 971, 978 (8th Cir. 2008) ("We

may set an award aside . . . if the contract is not susceptible to the arbitrator's

interpretation.") (citation omitted); McGrann v. First Albany Corp., 424 F.3d 743, 748

(8th Cir. 2005).  When an arbitrator "interprets unambiguous language in any way

different from its plain meaning, [he] amends or alters the agreement and acts without

authority."  Mo. River, 267 F.3d at 855 (quoting Osceola Cnty., 914 F.2d at 1075).

Stated differently, an arbitration award "does not draw its essence from the [parties']

contract [when] it is expressly contrary to the terms of the agreement."  Int'l Paper Co. v.

United Paperworkers Int'l Union, 215 F.3d 815, 818 n.1 (8th Cir. 2000).  In the Court's

view, that is the case here.

As noted above, the CBA incorporates by reference the provisions of postal

handbooks "directly relat[ing] to wages, hours or working conditions," including those

concerning lockers.  (AR 136-37.)  The arbitrator applied the terms of one such

handbook, the 2007 AS-503, without offering any explanation why he found it applicable

to the Eagan P&DC.  This is critical, because the AS-503 *specifically and expressly provides* that criteria for MPFs had been "extracted" and "compiled in a separate" document, namely, the MPF Design Criteria handbook.  (AR 772.)  The arbitrator nowhere indicated, or even remotely suggested, that he believed the terms of the AS-503 were somehow ambiguous regarding its scope and reach, and the Court does not believe that to be the case.

For these reasons, the Court concludes that the arbitrator did more than simply *misinterpret* the CBA.  Rather, he essentially "rewrote it," foisting requirements onto the Postal Service that did not exist.  Mo. River, 267 F.3d at 855.  He was "not free to ignore or abandon the plain language" of the AS-503 and apply it to the P&DC, "in effect amend[ing] . . . the [CBA] without authority."  Excel Corp. v. United Food & Commercial Workers Int'l Union, 102 F.3d 1464, 1468 (8th Cir. 1996); accord, e.g., Boise Cascade Corp. v. Paper Allied-Indus., Chem. & Energy Workers (PACE), Local 7-0159, 309 F.3d 1075, 1081 (8th Cir. 2002) ("We may not vacate the award simply because we disagree with [the arbitrator's] interpretation, unless that interpretation so directly contradicts the plain meaning of the parties' agreement that it effectively rewrites it."); Int'l Paper, 215 F.3d at 817; Keebler Co., 80 F.3d at 287; Coca-Cola Bottling Co. of St. Louis v. Teamsters Local Union No. 688, 959 F.2d 1438, 1440 (8th Cir. 1992).

This is not to suggest the Court does not understand the arbitrator's error.  Although the Postal Service seems to have relied on the MPF Design Criteria handbook at grievance steps 2 and 3, it repeatedly cited that handbook as the AS-503.  Accordingly, the arbitrator likely assumed this document applied to the P&DC.  But this

understandable error does not insulate the award from judicial review.  The arbitrator was

not free to ignore the AS-503's express limitations on its applicability.  By applying that

handbook without "offer[ing] [a] clear basis for how he construed" it to be applicable in

light of the clear limitations on its reach, the award must be set aside.  George A. Hormel

& Co. v. United Food & Commercial Workers, Local 9, 879 F.2d 347, 351 (8th Cir.

1989) ("[W]here a decision does not account for essential clauses [in a contract] and does

not give a reason for the failure to mention essential clauses, the award has been

vacated."); see also Boise Cascade, 309 F.3d at 1083 n.7 ("Where, as here, the arbitrator

fails to discuss critical contract terminology, which terminology might reasonably require

an opposite result, the award cannot be considered to draw its essence from the

contract.") (citation omitted); Beardsly v. Chi. & N.W. Transp. Co., 850 F.2d 1255, 1263,

1269-70 (8th Cir. 1988).

Notably, the Union nowhere contends that the AS-503 is applicable to the P&DC,

which is logical given the express limitations on its reach.  Indeed, at oral argument, it

recognized that the AS-503 is facially *inapplicable* to the Eagan P&DC and all other

MPFs.  Rather, the Union defends the award by arguing that the Postal Service's failure

to cite the MPF Design Criteria handbook during the grievance process essentially

resulted in its waiver of reliance thereon, noting that the CBA (AR 105-07) obligates the

parties to ensure that all relevant facts and contentions are developed in the grievance

process.  (Def. Mem. in Supp. at 14-15 ("During the entire period of handling of the

grievance prior to arbitration, the Postal Service failed to invoke or produce the MPF

Design Criteria [handbook], a document that it ought to have been able to produce if the [Postal Service] actually relied on it.").)

But the Union's argument suffers from two fundamental flaws. First, it is clear that the Postal Service *did* proffer and rely upon the MPF Design Criteria handbook during the grievance process. Indeed, the 2010 version of that document is in the administrative record (AR 780-82) and was quoted (albeit mis-cited as the AS-503) by the Postal Service at steps 2 and 3, as well as the Union in its appeal to arbitration. Second, and more importantly, even if the Postal Service had failed to rely upon the MPF Design Criteria handbook during the grievance process, the arbitrator was not free to ignore that *on its face*, the AS-503 does not apply to MPFs such as the P&DC.

The Union also labels the arbitrator's conclusion that the Postal Service had not produced the MPF Design Criteria handbook during the grievance process an "essentially unreviewable" factual finding. (Def. Mem. in Supp. at 13.) But this is a red herring. Whether the Postal Service produced the MPF Design Criteria handbook during the grievance process is irrelevant. The plain language of the AS-503 – the document actually utilized by the arbitrator – indicates that it simply *does not apply* to MPFs. It expressly provides that "the criteria related to" mail processing facilities "ha[ve] been extracted and compiled in a separate folder named 'MPF' (Mail Processing Facilities)." (AR 772; accord id. 773; id. 778 (requirements for mail processing facilities "have been extracted . . . and are now contained under a separate folder on the Building Design

Standards CD-ROM").)  The arbitrator enjoyed no license to ignore this language, and he offered no explanation why he did so.[9]

For all of these reasons, the Court concludes that the arbitration award cannot stand.  This does not mean, however, that the Court is free to resolve the merits of the parties' dispute.  "Even when the arbitrator's award may properly be vacated, the appropriate remedy is to remand the case for further arbitration proceedings."  <u>Garvey</u>, 532 U.S. at 511.  "[A]s a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for in the collective-bargaining agreement."  <u>Misco</u>, 484 U.S. at 40 n.10. Instead, the Court "should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement."  <u>Id.</u>  As there is no indication here that the CBA bars further arbitration proceedings, remand is appropriate.

## CONCLUSION

The Court recognizes that there is some measure of "unfairness" in the result it has reached.  To be sure, the Postal Service could have made clearer its reliance upon the MPF Design Criteria handbook – the correct document – in the grievance process.  The arbitrator applied the only document to which the parties had repeatedly referred, the AS-503.  In this sense, there is a kernel of truth to the Union's argument that the Postal

---

[9] In any event, an arbitration award is not shielded from review simply by "characteriz[ing] [the arbitrator's] actions outside of his authority as fact-finding."  <u>Coca-Cola Bottling</u>, 959 F.2d at 1442.

Service "cited one provision of the CBA as the basis for [its arguments] . . . all the way through the grievance procedure and then tried to rely on another provision in arbitration."  (Def. Mem. in Opp'n at 20.)

But it is clear that the Postal Service actually was relying upon the MPF Design Criteria handbook at grievance steps 2 and 3, even though it cited that document incorrectly.  More importantly, even without that handbook in the record, the arbitrator offered no explanation why he believed he could apply the AS-503 to the Eagan P&DC when that document specifically and expressly provided that the criteria for MPFs were not contained in that document.  By ordering the Postal Service to comply with those criteria when it had no contractual obligation to do so, the arbitrator re-wrote the parties' agreement.  The award simply cannot stand.[10]

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that the Union's Motion for Summary Judgment (Doc. No. 14) is **DENIED** and the Postal Service's Motion for Summary Judgment (Doc. No. 17) is **GRANTED**. The arbitration award is **VACATED**, and this matter is **REMANDED** for further arbitration proceedings.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  November 27, 2012

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

[10] For this reason, the Court need not (and does not) reach the Postal Service's alternative argument that the award manifestly disregards the law.